15-1154

# United States Court of Appeals
## for the
# Tenth Circuit

◆▮◆

BWP MEDIA USA, INC. d/b/a Pacific Coast News;
NATIONAL PHOTO GROUP, LLC,

*Plaintiffs-Appellants,*

– v. –

CLARITY DIGITAL GROUP, LLC n/k/a
AXS DIGITAL MEDIA GROUP, LLC,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO (DENVER)
THE HONORABLE PHILIP A. BRIMMER
D.C. NO. 1:14-CV-00467-PAB-KMT

## BRIEF FOR PLAINTIFFS-APPELLANTS

SANDERS LAW, PLLC
*Attorneys for Plaintiffs-Appellants*
100 Garden City Plaza, Suite 500
Garden City, New York 11530
(516) 203-7600

Dated: July 31, 2015

**ORAL ARGUMENT REQUESTED**
**SCANNED PDF FORMAT ATTACHMENTS ARE INCLUDED**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. Proc. 26.1(a), the undersigned counsel for Plaintiffs/Appellants BWP Media USA Inc. d/b/a Pacific Coast News ("BWP") and National Photo Group, LLC ("NPG") state as follows:

BWP is a corporation formed and existing under the laws of the State of Delaware with no parent company, and no publicly held corporation owns 10% or more of its stock.

NPG is a limited liability company formed and existing under the laws of the State of California with no parent company, and no publicly held corporation holds 10% or more of a membership interest in said company.

## TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF PRIOR OR RELATED APPEALS............................ viii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUE................................................................1

STATEMENT OF THE CASE..................................................................3

STATEMENT OF THE FACTS ...............................................................4

SUMMARY OF THE ARGUMENT ........................................................9

STANDARD OF REVIEW ...................................................................12

ARGUMENT .........................................................................................13

  A.  THE PURPOSE OF THE DMCA.................................................13

  B.  THE DISTRICT COURT FAILED IN ITS STATUTORY ANALYSIS
      BY IGNORING THE EXPRESS PROVISIONS OF 17 U.S.C. §512(N).......18

  C.  THE TERM "USER" CANNOT BE ACCORDED ITS ORDINARY,
      DICTIONARY MEANING FOR PURPOSES OF INTERPRETING 17
      U.S.C. §512(C)...........................................................................22

  D.  THE DISTRICT COURT ERRED IN FINDING THAT EXAMINERS
      ARE USERS WITHIN THE MEANING OF 17 U.S.C. §512(C) .................30

    1.  Examiners Are Compensated ...................................................30

    2.  Examiners Work Pursuant to a Written Contract .......................31

    3.  Defendant Exerts Control Over its Website and Examiners ......................31

  E.  THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFFS'
      PHOTOGRAPHS WERE STORED AT THE DIRECTION OF A USER.....32

i

F.   THE DISTRICT COURT ERRED IN HOLDING THAT THE
     PRINCIPLES OF AGENCY LAW WERE IRRELEVANT TO ITS
     DETERMINATION ...................................................................................36

1.  An Actual Agency Relationship Exists Between Clarity and its
    Examiners ...............................................................................................38

2.  An Apparent Agency Relationship Exists Between Clarity and its
    Examiners ...............................................................................................41

CONCLUSION ............................................................................................43

REQUEST FOR ORAL ARGUMENT ...............................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7) ..............................44

# TABLE OF AUTHORITIES

## Cases

*Am. Sur. Co. v. Pauly*,
  170 U.S. 133 (1898)................................................................37

*Anderson v. Gen. Am. Life Ins. Co.*,
  141 F.2d 898 (6th Cir. 1944) ...............................................37

*Baker v. Texas & Pacific R. Co.*,
  359 U.S. 227 (1959)...............................................................39

*Bridger Coal Co./Pac. Minerals, Inc. v. Director, Office of Workers'*
  *Compensation Programs*,
  927 F.2d 1150 (10th Cir. 1991) ............................................21

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F.Supp.2d 627 (S.D.N.Y. 2011) ....................................29

*Capital Records, Inc. v. MP3tunes, LLC*,
  --- F.Supp.3d ---, 2014 WL 4851719 (.S.D.N.Y. 2014) ......................... 19, 23, 27

*Capitol Records, LLC v. Escape Media Group, Inc.*,
  --- F.Supp.3d ----, 2015 WL 1402049 (S.D.N.Y. 2015).......................................29

*Capitol Records, LLC v. Vimeo, LLC*,
  972 F.Supp.2d 500 (S.D.N.Y. 2013) ..................................... 10, 14, 23, 27, 38, 43

*Columbia Pictures Industries, Inc. v. Fung*,
  --- F.Supp.3d ----,  2009 WL 6355911(C.D.Cal. 2009) affirmed in part as
  modified by *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th
  Cir. 2013) ............................................................................. 10,  41, 42

*Commonwealth Cas. Ins. Co. v. Kuhrt*,
  75 Colo. 175 (Supreme Court of Colorado, 1924) ...............................12

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989)...............................................................39

*Donaca v. Dish Network, LLC*,
   303 F.R.D. 390 (D.Colo. 2014). ........................................................................42

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ..........................................................................15

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir. 1971) ............................................................................38

*Global–Tech Appliances, Inc. v. SEB S.A.*,
   ⸺ U.S. ⸺, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011) ....................................35

*In re Aimster Copyright Litig.*,
   334 F.3d 643 (7th Cir. 2003) .............................................................................35

*Kelley v. Southern Pacific Co.*,
   419 U.S. 318 (1974)............................................................................................39

*Malloy v. Fong*,
   37 Cal.2d 356 (1951) .........................................................................................40

*Martin Marietta Corp. v. Gould, Inc.*,
   70 F.3d 768 (4th Cir. 1995) ...............................................................................37

*Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)............................................................................................36

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ...........................................................................................32

*DeRosa v. Nat'l Envelope Corp.*,
   595 F.3d 99 (2d Cir. 2010) ................................................................................32

*New Mexico Cattle Growers Ass'n v. United States Fish and Wildlife Serv.*,
   248 F.3d 1277 (10th Cir. 2001) .........................................................................21

*Obodai v. Demand Media, Inc.*,
   --- F.Supp.3d ---, 2012 WL 2189740 (S.D.N.Y. 2012).......................................9

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F.Supp.2d 1146 (C.D.Ca. 2002) ...................................................33

*Ridenous v. Kaiser-Hill Co., LLC*,
   397 F.3d 925 (10th Cir. 2005) ...........................................................21

*Sigmon v. CommunityCare HMO, Inc.*,
   234 F.3d 1121 (10th Cir. 2000). ................................................. 12, 13

*Thomas v. Metropolitan Life Ins. Co.*,
   631 F.3d 1153 (10th Cir. 2011) .........................................................23

*Tiffany (NJ) Inc. v. eBay, Inc.*,
   600 F.3d 93 (2d Cir. 2010) ................................................................35

*Timmons v. White*,
   314 F.3d 1229 (10th Cir. 2003) .................................................. 12, 13

*Tonelli v. United States*,
   60 F.3d 492 (8th Cir. 1995) ...............................................................37

*UMG Recording, Inc.  v. Escape Media Group, Inc.*,
   -- F.Supp.3d ---, 2014 WL 5089743 (S.D.N.Y. 2014) ........................... 19, 23, 27

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
   667 F.3d 1022 (9th Cir. 2011) ................................................. 9, 25, 28, 31, 33, 36

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
   620 F.Supp.2d 1081 (C.D.Ca. 2008) ............................................9, 30

*United States v. Aina-Marshall*,
   336 F.3d 167, 170 (2d Cir. 2003) ......................................................35

*United States v. Dico, Inc.*
   4 F.Supp.3d 1047 (S.D.Ia 2014) ........................................................37

*United States v. Texas*,
   507 U.S. 529 (1993).............................................................................29

*Viacom Intern., Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir 2012) ............................................................9, 14

*Ward v. Atlantic Coast Line R. Co.*,
  362 U.S. 396 (1960)...........................................................................39

*Wolf v. Prudential Ins. Co. of Am.*,
  50 F.3d 793 (10th Cir. 1995) ............................................................13

*Wright v. Fed. Bureau of Prisons*,
  451 F.3d 1231 (10th Cir. 2006) ........................................................23

**Statutes**

17 U.S.C.
  §500 et. seq ........................................................................................1
  §512...................................................................................................14
  §512(a).................................................................................................2
  §512(b).................................................................................................2
  §512(b)(1)(A).....................................................................................21
  §512(c)(1)(A).....................................................................................24
  §512(c).................................................................................................3
  §512(c)(1)(a)(i)..................................................................................12
  §512(c):..............................................................................................16
  §512(n) ................................................................................ 11, 18, 20

28 U.S.C.
  §1291....................................................................................................1
  §1331....................................................................................................1
  §1338(a)...............................................................................................1

Federa Rules Civil Procedure
  56(c) ..................................................................................................13

Federal Rules of Appellate Procedure
  4(a)(1)(A)............................................................................................1

**Other Authorities**

Merriam-Webster's Collegiate Dictionary 1297 (10th ed. 2001)..............................24

U.S. Congress, Senate, The Digital Millennium Copyright Act Of 1998, 105th
    Cong., 2d sess., 1997-1998, S. Rep. 105–190 .....................................................16

U.S. Congress, House, The Digital Millennium Copyright Act Of 1998, 105th
    Cong., 2d sess., 1997-1998, H.R. Rep. 105–551(II) ...........................................16

**Treatises**

Restatement (Second) of Agency §272 ....................................................................37

Restatement (Third) of Agency, §2.03 (2006)........................................... 39, 41, 42

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over the federal copyright infringement claims pursuant to 28 U.S.C. §1338(a), 28 U.S.C. §1331 and 17 U.S.C. §500 et seq. The District Court granted defendant's motion for summary judgment on March 31, 2015 (the "Order")[1] and it entered final judgment on March 31, 2015.  Plaintiffs-Appellants timely filed their notice of appeal on April 28, 2015 pursuant to Federal Rule of Appellate Procedure §4(a)(1)(A), providing jurisdiction to this Court under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUE

This matter will determine if an internet service provider ("ISP") that selects, controls and guides the contributors to its website can still attribute the content to being "user generated" so as to secure immunity under the Digital Millennium Copyright Act ("DMCA") for the contributor's acts of copyright infringement. See 17 U.S.C. §512.  According to the District Court, it may: (i) hand-select the individuals it wants to serve as contributors to its website; (ii) require them to enter into an express, written agreement granting them (and only them) permission to post content to the website; (iii) regularly send emails to those

---

[1]  ""A-__" refers to Appellants' Appendix.  The Order and Judgment are reproduced as an attachment to this Brief, as well as in the Appendix at pp. A-283 – A-306, and pp. A-307 – A-308, respectively.

1

contributors requesting submissions on a particular topic; and (iv) engage in revenue sharing with those individuals based upon the amount and quality of traffic the posts generate. Because this holding would greatly upset the balance between copyright owners and ISPs sought by Congress in the enactment of the DMCA, this Court must reverse.

Specifically, Plaintiffs raise six questions on appeal:

1. Did the District Court err by applying 17 U.S.C. §§512(a) and (b) for the purpose of defining terms used in subsection §512(c), when such use is specifically precluded by subsection §512(n)?

2. Did the District Court err in finding that the term "user" was to be afforded its ordinary dictionary definition for purposes of interpreting the provisions of 17 U.S.C. §512(c), the result of which expands the DMCA safe-harbor and eviscerates copyright protection?

3. Did the District Court err in finding that Defendant's "Examiners" are "Users" within the meaning of 17 U.S.C. §512(c), when uncontroverted evidence showed an express contractual relationship and revenue sharing between Defendant and its Examiners?

4. Did the District Court err in finding that Plaintiffs' photographs were posted "at the direction of a user" within the meaning of 17 U.S.C. §512(c), when the uncontroverted evidence showed that Defendant actively solicited specific content from its Examiners?

5. Did the District Court err in finding that agency law was irrelevant to its consideration of DMCA-related issues?

6. Did the District Court err in applying the rules governing summary judgment by not viewing the facts in a light most favorable to Plaintiffs and by making impermissible credibility determinations?

Plaintiffs submit that each of the foregoing questions must be answered in the affirmative.  Consequently, this Court must reverse.

## STATEMENT OF THE CASE

Plaintiffs commenced this action against Clarity Digital Group, LLC ("Defendant" and/or "Clarity") on February 24, 2014, following their discovery that Defendant unlawfully copied, posted and/or otherwise displayed seventy-five (75) of Plaintiffs' photographs on *Examiner.com*. A-289.

On May 15, 2014, Defendant filed a motion for summary judgment under Fed. R. Civ. P. 56 alleging a complete and absolute defense to Plaintiffs' claims under the DMCA. A-290. In support of this position, Defendant argued that it was entitled to immunity under the "safe harbor" provision of 17 U.S.C. §512(c), as the photographs at issue were purportedly posted "at the direction of a user." A-290. In the alternative, Defendant argued that it was entitled to summary judgment on Plaintiffs' claim of inducement of copyright infringement. A-291.

On June 20, 2014, Plaintiffs filed a motion under Fed. R. Civ. P. 56(d) seeking to defer further briefing on Defendant's motion pending discovery on the applicability of the safe harbor provision. On August 7, 2014, the assigned magistrate judge granted Plaintiffs' motion in part and limited discovery commenced thereafter. A-291.

3

On February 17, 2015, Plaintiffs filed their response brief to Defendant's motion for summary judgment.   A-291.   In opposing Defendant's motion, Plaintiffs argued that Defendant's Examiners are not "users" within the meaning of 17 U.S.C. §512(c) and/or that an agency relationship existed between Clarity and its Examiners, such that Clarity would be disqualified from the safe harbor due to imputed knowledge of the infringements. Dkt.[2] 63, *et seq.*.

On March 9, 2015, Defendant filed its response brief. Dkt. 65, *et seq.*

By Order dated March 31, 2015, the District Court granted summary judgment to Defendant.

## STATEMENT OF THE FACTS

Plaintiffs BWP Media USA Inc. d/b/a Pacific Coast News ("BWP") and National Photo Group, LLC ("NPG")[3] are the legal and beneficial owners of a multitude of photographs primarily featuring celebrities.  A-283. As a regular part of their businesses, Plaintiffs license their photographs for use in online and print publications. *Id.*

Defendant is the owner and operator of the website known as www.examiner.com ("Examiner.com" and/or the "Website"). A-283. All of the content posted to Examiner.com is produced by regular contributors, who

---

[2] Dkt. refers to the underlying docket number in the District Court below.
[3] BWP and NPG are referred to collectively herein as "Plaintiffs."

Defendant refers to as "Examiners" (tantamount to reporters). A-284. Examiner.com features content on a variety of topics, including celebrity gossip.

Defendant recruits individuals to become Examiners through referrals, targeted advertisements, and community outreach. A-284. Defendant holds its Examiners out as being credible, passionate, and influential persons due to their subject matter expertise. A-183.

In order to become an Examiner, interested persons must submit an application and writing sample. A-284, A-183. As part of the application, applicants must indicate the topic on which they wish to write. *Id*. Defendant reviews applications from potential Examiners to confirm that the applicant's writing skills are commensurate with Defendant's standards, that the applicant is knowledgeable about the topic s/he has chosen, and that the applicant is qualified by Defendant's standards to create the type of content Defendant wishes to feature on Examiner.com. A-284, A-183.

Once an individual's application has been initially approved, Defendant conducts a background check on the applicant. A-284, A-184. If an applicant is found to have provided any false information in his or her application, it is cause for "immediate dismissal." A-284.

Once Defendant accepts an applicant, it sends the applicant, now an "Examiner," an email directing the topic on which that Examiner will provide

content. A-284.  The Examiner must also enter into the "Examiners Independent Contractor Agreement and License" (the "Examiner Agreement"[4]) before receiving permission to post to the Website.  A-284.  By signing the Examiner Agreement, the Examiner agrees to use his or her "best efforts" to create works on a topic for a specific Examiner.com, maintain his or her topic page, publish works to the topic page using the Examiner.com publishing application, create an online community related to his or her topic page, and drive traffic to the topic page through the usage of photographs.  A284-285[5].

The Examiner Agreement further requires Examiners to "regularly create and post new Works to [Examiner.com] and update the Web Page as often as reasonably needed."  A-285.  Critically, the Examiner Agreement obligates the Examiner to "coordinate with a representative designated by Examiner.com . . . in the provision of the Services… [and] alert the Representative regarding any important or interesting Works to be featured on the Web Page." A-285.  This is consistent with a statement previously appearing publicly on the Website, which

---

[4] A copy of the Examiner Agreement is located at A-133 – A-139.

[5] Once an Examiner has been approved and has agreed to Defendant's terms, the Examiner is given authorization to use Defendant's publishing tool to contribute content directly to Examiner.com on the Examiner's assigned topic. A-287.  The Examiner posts content on an assigned topic directly to his or her topic page, however, once an article is posted on the topic page, it is Defendant who exclusively determines whether an article will be featured elsewhere on the site, such as the Examiner.com main page or the Website's "Arts & Entertainment" page. *Id.*

asserted that Examiner.com has a team of "Content Managers and a Review Team who … are constantly providing editorial guidance and monitoring content to ensure there is the highest quality of accurate information on the site." A-183.

Although Defendant initially disavowed knowledge of that statement being posted on the Website, it later admitted that the statement *was* posted to the Website in or about 2012, and remained thereon until May 27, 2014, after the commencement of this action. A-280 – A-281. Further, while Defendant has averred that it does not provide editorial guidance or monitor content, it has not denied that the Examiner Agreement requires Examiners to coordinate with a representative of Defendant's in providing his/her services under the agreement. A-133.

In fact, the evidence before the District Court showed that Defendant does monitor content and activity, as Plaintiffs introduced emails from Defendant's staff to Examiners "who haven't published this month," encouraging each Examiner to publish before a certain date to "keep your account active." A-289.  In addition, Plaintiffs provided an email exchange between Defendant's Director of Content, Matt Sandy, and one of the subject Examiner's, Sara Gundell, discussing the lack of traffic generated by Ms. Gundell's posts and engaging and providing direction in a dialogue regarding the importance of developing her page.  A-288 – A-289. Moreover, Plaintiffs cited to a series of regularly generated emails from Defendant

to Examiners requesting submissions on particular topics, such as the Oscars (A-221), the best new television shows (A-222), celebrity comebacks (A-228), celebrity pitfalls (A-230), etc.  Many of these emails encourage Examiners to post photographs with their articles.[6]

Finally, and perhaps most significantly, Defendant pays its Examiners for posting infringing content to Examiner.com.  As the District Court found, Examiners are compensated for their posts pursuant to the Examiner.com Payment Policy.  A-286. In order to be eligible for compensation, an Examiner must post a new article at least once a month.  *Id*. The amount of compensation an Examiner receives is determined by a number of factors, including revenue, subscriptions, sponsorship, page traffic, and session length. *Id*.  In this case, Defendant paid the Examiners who unlawfully used Plaintiffs' photographs in their articles earned $415,907.56 between June 2012 and February 2014. *Id*.

---

[6] See A-224 (compile slideshows of on-set photos); A-230 (compile slideshow of celebrity mugshots); A-236 (celebrity bodies – "slideshows are a must for this area"); A-241 (provide a slideshow of celebrity career moments); A-243 (provide slideshows of past and current Emmy guests; provide slideshows of predicted Emmy winners; provide slideshows of last year's red carpet looks; night of the Emmys – **provide photos as they come in**) (emphasis added); A-245 (provide slideshows of best couples and best young celebrities);  A-249 (create a slideshow of scenes from the red carpet); A-258 (compile slideshows of the funniest celebrity flubs in recent years); A-268 (compile on-set photos from *The Amazing Spider-Man* or *The Dark Knight Rises*) A-274 (compile slideshows detailing improvements in animation from film to film).

8

## SUMMARY OF THE ARGUMENT

The instant case presented an issue of first impression to the District Court. Likewise, this appeal is one of first impression to this Circuit and, further, to all of the other Circuits nationwide. Specifically, Plaintiffs asked the District Court to construe the word "user" within the meaning of 17 U.S.C. §512(c) to exclude the activities of the Examiners herein. Although several courts have discussed the meaning of the phrase "by reason of the storage" under 17 U.S.C. §512(c),[7] there appear to be only two (2) reported decisions in which a court has addressed the meaning of the phrase "at the direction of a user." *See, Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 6355911(C.D.Cal. 2009) ("*Fung*") aff'd in part as modified by *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ("*Fung II*"); and *Capitol Records, LLC v. Vimeo, LLC*, 972 F.Supp.2d 500, 509 (S.D.N.Y. 2013) ("*Vimeo*").

Because this phrase has almost entirely evaded judicial interpretation, Plaintiffs called upon the District Court to do so in a manner that would maintain

---

[7] *See, e.g., UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F.Supp.2d 1081 (C.D.Ca. 2008) ("*UMG I*") aff'd *UMG Recordings, Inc. v. Shelter Capital Partners LLC,* 667 F.3d 1022 (9th Cir. 2011) ("*UMG II*") opinion withdrawn and superseded on rehearing by *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) ("*UMG III*"); *Obodai v. Demand Media, Inc*., 2012 WL 2189740 (S.D.N.Y. 2012) ("storage" ... is "meant to cover more than mere electronic storage lockers"); *Viacom International Inc. v. YouTube*, *Inc.,* 676 F.3d 19 (2d Cir. 2012) (YouTube's software functions occurred "by reason of" user storage).

9

the balance between rights-holders and ISPs underpinning Congress' enactment of the DMCA.  In support of their position below, Plaintiffs noted that while the DMCA does not offer a definition of the term "user," it is clear from the purpose of the statute and the resulting case law (limited as it may be), that the term is not intended to be used in its common parlance which, as the District Court found, is simply "one who uses." For example, owners, employees, and agents typically "use" their business's website and, therefore, would be considered a "user" of a system, if that term were intended to have its literal definition, thereby absurdly expanding the DMCA to provide immunity in every case. Consequently, Plaintiffs argued that the word "user" must be a legal term of art within the meaning of 17 U.S.C. §512(c).[8]

The District Court began by acknowledging that no court has been called upon to squarely construe this term but, nonetheless, found that the statutory language was not ambiguous. Thus, it applied the dictionary definition to the term; to wit, "one that uses."  In support of its conclusion, the District Court cited to the provisions of 17 U.S.C. §§512(a)(1) and 512(b), noting that such sections utilize

---

[8] *See e.g. UMG Recording, Inc. v. Escape Media Group, Inc*. 2014 WL 5089743 (S.D.N.Y. 2014) (defendant liable for employee uploads despite DMCA registration); *Capitol Records, Inc. v. MP3tunes, LLC*, --- F.Supp.3d ----, 2014 WL 4851719 (S.D.N.Y. 2014) (executive acts of infringements were not covered under DMCA since defendant had actual knowledge of infringing content); *Capitol Records, LLC v. Vimeo, LLC*, 972 F.Supp.2d 500, 518 (S.D.N.Y. 2013) (DMCA inapplicable to posts by individuals who were undisputedly employees of the defendant and who themselves uploaded the infringing videos to the Vimeo site).

the phrase "a person other than the service provider" to differentiate between the service provider and other persons.

The District Court's reasoning in this regard was error insofar as it relied on 17 U.S.C. §§512(a)(1) and 512(b)(1)(A) to interpret the term "user" contained in 512(c), as such reliance is explicitly violative of 17 U.S.C. §512(n). That section dictates that subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying the DMCA safe harbors and are each to be construed independently of one another. 17 U.S.C. §512(n).

In this regard, Plaintiffs argued that Defendant hand-selects only those Examiners who have demonstrated an ability to write the type of articles that Defendant wants to appear on Examiner.com, then, its content managers send regular correspondence to those Examiners, urging them to post celebrity photos [*see* FN4, *supra*] with promise of remuneration based upon the volume of traffic generated by their individual page(s). Since the "Examiners" are not the uncensored, undirected, and uncompensated users that the DMCA was intended to cover, Plaintiffs argued that they should not be considered "users" within the meaning of 17 U.S.C. §512(c). Simply, if the District Court's decision were to be affirmed, it would create precedent that greatly expands the safe harbor protections of 17 U.S.C. §512(c) far beyond the scope intended by Congress. Indeed, it would

establish that <u>anyone</u> who accesses a website, whether as owner, employee or visitor, would be a "user" under the statute.

The District Court also rejected Plaintiffs' argument that the principles of agency law are relevant to the analysis of the safe harbor protections of 17 U.S.C. §512(c). This was error to the extent that the existence of an agency relationship would result in a determination that the acts of the agent working within the scope of said agency are attributable to the principal. See, e.g., *Commonwealth Cas. Ins. Co. v. Kuhrt*, 75 Colo. 175 (Supreme Court of Colorado, 1924). As applied to this case, if an agency relationship existed between Defendant and its Examiners, then the District Court would have been compelled to find that Defendant was disqualified from the safe harbor protections of 17 U.S.C. §512(c), regardless of whether Examiners are "users" within the meaning ascribed by the District Court, based upon the imputed actual knowledge of infringement by the Examiner-User-Agent to the Defendant-ISP-Principal. 17 U.S.C. §512(c)(1)(a)(i).

For all these reasons, as well as those set forth herein, this Court must reverse.

## STANDARD OF REVIEW

The grant of summary judgment is subject to *de novo* review by this Court. *Timmons v. White,* 314 F.3d 1229, 1232 (10th Cir. 2003) citing *Sigmon v. CommunityCare HMO, Inc*., 234 F.3d 1121, 1124 (10th Cir. 2000). "If there is no

genuine issue of material fact, then the reviewing court must determine if the district court correctly applied the law." *Id.* citing *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). Here, there are few disputes as to the facts. Instead, the parties' dispute centers on the legal conclusions to be drawn from those facts. It is respectfully submitted that the District Court did not correctly apply the law to the facts. As a result, Plaintiffs submit that this Court must reverse.

## ARGUMENT

### A. THE PURPOSE OF THE DMCA

"Congress enacted the DMCA in 1998 to update domestic copyright law for the digital age." *Vimeo,* 972 F.Supp.2d at 509, quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26 (2d Cir. 2012) (internal quotations omitted) ("*YouTube*").

"Title II of the DMCA, codified at 17 U.S.C. §512, seeks to preserve strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in a digital networked environment." *Id.* quoting U.S. Congress, Senate, The Digital Millennium Copyright Act Of 1998, 105th Cong., 2d sess., 1997-1998, S. Rep. 105–190, at 20; U.S. Congress, House, The Digital Millennium Copyright Act Of 1998, 105th Cong., 2d sess., 1997-1998, H.R. Rep. 105–551(II), at 49 (internal quotations and

13

brackets omitted). The reason for this was Congress' recognition that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." *Id*. quoting S. Rep. No. 105–190, at 8.

Notwithstanding the foregoing, Congress did not intend to give ISPs a competitive advantage over their terrestrial counterparts who are held accountable to laws of general applicability. Indeed, as the Court of Appeals for the Ninth Circuit cautioned,

> "The Internet is no longer a fragile new means of communication that could easily be smothered in the cradle by overzealous enforcement of laws and regulations applicable to brick-and-mortar businesses. Rather, it has become a dominant—perhaps the preeminent—means through which commerce is conducted. And its vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability."

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1164, n.15 (9th Cir. 2008) ("*Roommates*"). Although *Roommates* was decided on other grounds, the proclamation that an exception to the laws of general applicability specifically designed to benefit ISPs "was not meant to create a lawless no-man's-land on the Internet" (*Roommates,* 521 F.3d at 1164) remains equally applicable here.

14

Indeed, the Senate Report clearly identifies the competing concerns considered in debating the statute:

> "Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy.

> At the same time, without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet. In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability."

U.S. Congress, Senate, S. Rep. 105-190 at 8.

In light of the foregoing, it can be plainly seen that by enacting the DMCA, Congress intended to strike a balance between copyright owners and ISPs, and nothing more. For example, by ensuring copyright owners the exclusive right to control the copying and display of their works will remain enforceable in the Digital Age, Congress intended to preserve the freedom of artistic creation. Conversely, by carving out certain exceptions to liability for ISPs, Congress sought to foster the incentive to better the Internet. Certainly, nothing in the Legislative history suggests that Congress intended to eviscerate the rights of the artistic community in the name of advancements in technology. This is further evidenced in the Senate discussion of 17 U.S.C. §512(c):

15

"Subsection (c) limits the liability of qualifying service providers for claims of direct, vicarious and contributory infringement for storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider. **Examples of such storage include providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users.**"

*Id.,* 1998 WL 239623 at *43 (emphasis added).

In this case, Defendant's Website provides a sterling application and illustration of the Senate's commentary as to which activities will qualify for safe harbor protection, and which will not. Specifically, when one visits Examiner.com and selects an article to view, one will see that the returned page is essentially divided into three parts: the top half of the page displays the Examiner's article and pictures used to illustrate the article; below the article, in the middle of the page, are pictures with hyperlinks to other "recommended" articles on Examiner.com; and below the "recommended" section, toward the bottom of the page, is a section where anyone (i.e. not vetted applicants who are specifically trained, then contracted and also compensated) can post comments.

Visitors to the Website cannot alter, edit, correct, delete or otherwise modify an Examiner's article. Conversely, visitors to the Website can post any content of their choosing in the "comment" section of the page. In applying the provisions of Section 512(c), the top portion of the page, created by Defendant's paid Examiner(s), should not qualify for the safe harbor protection as it is not "user

generated," whereas the "comment" portion of the page would so qualify because it is composed by visitors to (or "users of") the Website.

The distinction is critical to the proper functioning of the DMCA. Specifically, if the District Court's decision is affirmed, it will pave the way for ISPs to pay persons to produce a specifically solicited product using stolen content and yet remain immune from liability to the rights-holder solely because the content would purportedly qualify as "user generated."

If the foregoing were to occur, it would undeniably give online businesses an unfair advantage over their real-world counterparts and eviscerate the rights of copyright holders in the online world.  For example, a print magazine would under all circumstances be liable to a copyright owner if one of its staff writers used a copyrighted photograph to illustrate his or her article without obtaining license or permission from the rights-holder, whereas an ISP would enjoy absolute immunity for the same conduct under the District Court's decision.  Stated otherwise, an affirmance would result in opening a Pandora's Box leading to the "lawless no-man's-land on the Internet" feared in *Roommates,* forever disrupting the balance Congress intended to strike between rights-holders and ISPs under the DMCA.

## B. THE DISTRICT COURT FAILED IN ITS STATUTORY ANALYSIS BY IGNORING THE EXPRESS PROVISIONS OF 17 U.S.C. § 512(n)

Perhaps the most obvious error in the District Court's decision was the fact that it ignored the express provisions of 17 U.S.C. §512(n) when considering Plaintiffs' argument for the interpretation of 17 U.S.C. §512(c); this despite recognizing the well-settled principle that a court should avoid interpreting a statutory provision "so as to render superfluous other provisions in the same enactment." A-297, quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 877 (1991). As will be discussed more fully herein, by looking to the provisions of Sections 512(a)(1) and 512(b)(1)(A) to interpret the meaning of a word used in Section 512(c), the District Court not only rendered the express provisions of 17 U.S.C. §512(n) meaningless, it ignored the legislative purpose discussed *supra.*

Plaintiffs argued that the developing body of case law shows that the word "user" was intended as a legal term of art within the meaning of 17 U.S.C. §512(c), such that it should exclude owners, employees, and agents from its definition. More specifically, Plaintiffs argued that the nature of the relationship between Clarity and its Examiners was sufficiently close that the Examiners should not be considered "users" vis-à-vis Examiner.com.

For example, Plaintiffs argued that courts have already found that owners, employees, agents (and even implied agents) are not "users" within the meaning of the DMCA safe harbor provisions. *See e.g. UMG Recording, Inc. v. Escape Media Group, Inc.* 2014 WL 5089743 (S.D.N.Y. 2014) ("*Escape Media*") (defendant liable for employee uploads despite DMCA registration); *Capitol Records, Inc. v. MP3tunes, LLC,* --- F.Supp.3d ----, 2014 WL 4851719 (S.D.N.Y. 2014) ("*MP3tunes*") (executive acts of infringements were not covered under DMCA since defendant had actual knowledge of infringing content); *Vimeo*, 972 F.Supp.2d at 518 (DMCA inapplicable to posts by individuals who were undisputedly employees of the defendant and who themselves uploaded the infringing videos to the Vimeo site). Consequently, Plaintiffs urged the District Court to find that case law dictates the word "user" is a legal term of art for purposes of applying the safe harbor provisions of the DMCA.

Although the District Court acknowledged that no court has been called upon to squarely construe this term, it nonetheless rejected Plaintiffs' argument, finding "[if] there is a need to distinguish between storage at the direction of the service provider and storage at the direction of third parties, such distinction [need not] be made through the interpretation of the word "user" … [and that] the perceived need to distinguish between service providers and third parties in the

language of §512(c)(1) does not exist." A-295 – A-296. In support of this

reasoning, the court stated:

> "as other provisions of §512 demonstrate, Congress knew how to
> make such a distinction without mentioning "user." Both
> §§512(a)(1) and 512(b)(1)(A) utilize the phrase "a person other
> than the service provider" to differentiate between the service
> provider and other persons."

A-296.

The District Court's citation to Sections 512(a)(1) and 512(b)(1)(A) to

support its conclusion that "Congress knew how to make such a distinction without

mentioning 'user'" expressly contradicts the rules of construction set out in the

statute itself. Critically, 17 U.S.C. §512(n) provides:

> "Subsections (a), (b), (c), and (d) describe separate and distinct
> functions for purposes of applying this section. Whether a
> service provider qualifies for the limitation on liability in any one
> of those subsections shall be based solely on the criteria in that
> subsection, and shall not affect a determination of whether that
> service provider qualifies for the limitations on liability under
> any other such subsection."

17 U.S.C. §512(n).

As was noted above, this Court has repeatedly held that it "must avoid,

whenever possible, a statutory interpretation that would 'render superfluous other

provisions in the same enactment.'" *Ridenous v. Kaiser-Hill Co., LLC* 397 F.3d

925, 941 (10th Cir. 2005) quoting *Freytag, supra*, and citing *New Mexico Cattle

Growers Ass'n v. United States Fish and Wildlife Serv*., 248 F.3d 1277, 1285 (10th

20

Cir. 2001) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous") quoting *Bridger Coal Co./Pac. Minerals, Inc. v. Director, Office of Workers' Compensation Programs*, 927 F.2d 1150, 1153 (10th Cir. 1991).

In this case, by relying on Sections 512(a)(1) and 512(b)(1)(A) for the purpose of interpreting the meaning of words used in Section 512(c), the District Court necessarily construed the statute in a way that rendered the provisions of 17 U.S.C. §512(n) meaningless and/or superfluous.

In addition, the District Court's decision fails to recognize the purpose of Section 512(c), as was stated in the congressional record. For example, the House Report describes Section 512(c) as being intended to protect ISPs from liability for infringement as a result of removing, disabling and/or blocking access to infringing material. Similarly, the Senate Report (quoted *supra*) indicates a clear intent to distinguish between a service provider, its employees, and its agents on the one hand, and third parties who interact with the website on the other. Consequently, for the District Court to ascribe the dictionary definition of the word "user" to the context of 17 U.S.C. §512(c) flies in the face of not only the legislative commentary, but the face of the statute itself.

## C. THE TERM "USER" CANNOT BE ACCORDED ITS ORDINARY DICTIONARY MEANING FOR PURPOSES OF INTERPRETING 17 U.S.C. §512(c)

More critical than the statutory construction error discussed *supra*, is the consequence of the District's Court's determination to use the ordinary meaning of the word "user" in its statutory analysis.  Plaintiffs urge this Court to find that the District Court erred in finding that the term "user" should bear its ordinary dictionary definition for purposes of interpreting that term within the meaning of 17 U.S.C. §512(c), since to do so would greatly upset the balance between ISPs and rights-holders that was intended by the DMCA.

As was noted above, the District Court properly found that "as the parties' briefs suggest, [] no court has [been called upon to] squarely construe[] the term." A-294.  Indeed, this question remains one of first impression for this Court, as it was to the District Court.  Although there is no case law directly on point to which either party can cite in support of their arguments herein, Plaintiffs respectfully submit that both the existing case law and public policy compel a determination in their favor, since affirming the District Court's Order would create precedent contrary to existing case law.

For example, Plaintiffs urged the lower court to find that the term "user" is not meant to be accorded its ordinary dictionary meaning because district courts have already found that owners, employees, and agents are not "users" within the

meaning of the DMCA safe harbor provisions despite being technical users of their computer systems. *See, e.g., Escape Media,* 2014 WL 5089743; *MP3tunes,* 2014 WL 4851719; *Vimeo*, 972 F.Supp.2d at 518. In considering this argument, the District Court began by looking to the basic rules of statutory construction, finding that "the Court begins with the plain language of the statute, interpreting it 'in light of the purposes Congress sought to serve' and considering a particular provision's place in the overall statutory scheme." A-294 quoting *Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006). "If the statutory language is clear, our analysis ends and we must apply its plain meaning." *Thomas v. Metropolitan Life Ins. Co*., 631 F.3d 1153, 1161 (10th Cir. 2011). Only "[i]f the court determines that the statute is ambiguous, the court then looks beyond the plain text to resolve the ambiguity, examining legislative intent [and] overall statutory construction." *Id*.

The District Court then looked to the dictionary definition of "user," which it found to be "one that uses."[9] A-295. The District Court found this description to be "consistent with[in] the generally understood meaning of the term in the DMCA context. *Id*. citing *YouTube,* 676 F.3d at 39 ("referring to "users" both as persons who upload content to YouTube and persons who access YouTube to view uploaded content"); *UMG II*' , 667 F.3d 1022.

---

[9] *Merriam-Webster's Collegiate Dictionary* 1297 (10th ed. 2001).

Satisfied with its brief analysis, the District Court concluded that "the perceived need to distinguish between service providers and third parties in the language of §512(c)(1) does not exist," finding that the "service provider behavior that plaintiffs are concerned about is already addressed in subparagraphs (A) through (C) of §512(c)(1)." A-296.  In support of its finding, the District Court held that under 17 U.S.C. §512(c)(1)(A), "although storage encompasses automated process[es] for making files accessible … service providers lose protection for activities they undertake that lack a causal connection to user-initiated storage of infringing material." *Id.* citing *UMG II* and *YouTube* (internal quotations omitted). The District Court similarly held that §512(c)(1)(B) excludes from safe harbor protection infringing activity that confers a financial benefit upon the service provider if the service provider "exert[s] substantial influence on the activities of users," such as "high levels of control over activities of users" or "purposeful conduct." A-297. quoting *UMG II.*

The District Court thus concluded that "to define the term 'user' narrowly or to read agency principles into the term would, in many instances, be unnecessary and redundant given the effect of §512(c)'s other provisions." *Id.* This analysis and conclusion, simply stated, is logically flawed. To illustrate this point, we begin with the language of the statute itself.  17 U.S.C. §512(c) provides:

> (1) In general.--A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for

24

injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider--

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity

17 U.S.C. §512(c).

To summarize, Section 512(c) provides an ISP with immunity from copyright infringement liability *if* the content was stored at the direction of a user *and* all three of the following conditions are met: (i) the ISP does not have actual or constructive knowledge that the material is infringing; (ii) the ISP does not receive a financial benefit directly attributable to the infringing activity; and (iii) upon being notified of an infringement, the ISP acts expeditiously to remove or disable access to that material.

Contrary to the District Court's conclusion, Subsections (A), (B) and (C) do not qualify the meaning of the word "user" within Section 512(c)(1). Instead, they provide additional criteria which must be met for an ISP to qualify for the safe harbor protection, *if* it has already been determined that the offending material was uploaded by a "user." Accordingly, Plaintiffs respectfully submit that the threshold question remains "was this content posted by a user?" In asking this question, it becomes clear that the District Court's decision cannot be correct because if a "user" is "one who uses," and since even the ISP's administrators are technically users of the website, any content on any website anywhere will always be uploaded by a "user," forever broadening the safe harbor protections of Section 512(c) to encompass and safe-harbor all internet activities.

Further to the this point, the District Court's reliance on the holdings in *YouTube* and *UMG II* alone for the purpose of considering the definition of a user was error because, by stopping there, its analysis was overly myopic and incomplete. For example, although the courts in *YouTube* and *UMG II* found that persons who upload content to the website(s) and visitors to the website(s) are both users, the District Court failed to consider the existing body of case law which has held that owners, employees, and agents are not "users" for purposes of qualifying for the safe harbor protections under 17 U.S.C. §512(c). *Escape Media,* 2014 WL 5089743; *MP3tunes,* 2014 WL 4851719; *Vimeo*, 972 F.Supp.2d at 518.

26

As it did with Section 512(n), the District Court once again failed to adhere to the rules of statutory construction that it had properly acknowledged. Specifically, if one applies the dictionary definition ("one who uses") to the term "user" within the meaning of 17 U.S.C. §512(c), then the holdings in *Escape Media, MP3tunes,* and *Vimeo* could not be reconciled with those in *YouTube* and *UMG II,* because the owners, employees, and agents in *Escape Media, MP3tunes,* and *Vimeo* also "used" the respective websites. Consequently, the District Court was obligated to find an ambiguity in the statute and look beyond the purportedly plain words to ascertain their true meaning.

In addition, the lower court's reliance on the holdings in *YouTube* and *UMG II* was also error to the extent that the facts therein are not analogous to this matter. For example, in *UMG II*, in order to qualify to share videos through the Veoh website, an individual need only provide an email address, user name, and password. *UMG II*, 667 F.3d at 1027. The same was true in *YouTube*. 676 F.3d at 28. In contrast to *YouTube* and *UMG II,* individuals cannot simply provide an email address, user name, and password to be entitled to post content to Examiner.com. Instead, an interested individual must first submit an application, then pass a background check, and then agree to sign a contract. A-284.

In addition, as all Examiners are at least potentially eligible to participate in revenue sharing, as a part of the application process, each Examiner must submit

an IRS Form W-9, which includes the Examiner's legal name, address, social security number, and other identifying information. This differentiates the relationship between Examiners and Defendant from "users" of websites like YouTube and Veoh, which hosts do not collect such personal information as a prerequisite to creating a user account with such websites.

Finally, under the Examiner Agreement, Examiners are prohibited from posting any of their Works on any other personal, commercial, or social media website without affixing the Examiner.com logo (as provided by Defendant), accompanied by the words "as published on Examiner.com," which logo contains a hyperlink back to the Work as published on the Website. A-135.  By way of comparison, there is no evidence to suggest that a user of YouTube, Veoh, or Vimeo is precluded from posting a copy of his/her own pictures or videos on his/her own Facebook, Twitter or Blogger page without including a logo identifying the content as being "as seen on YouTube/Veoh/Vimeo" and with the accompanying threat of having their YouTube/Veoh/Vimeo account privileges revoked, as is the case here.

As was discussed *supra,* Examiner.com presents a microcosm of the two differentiable environments: users vs. non-users.  The non-users of Examiner.com are the reporters-agents, termed Examiners, who create the content for the Website. The users of Examiner.com are the anonymous, or near anonymous, people who

28

comment on those stories. Unfortunately, there is no reported case that has analyzed a DMCA defense in the aforementioned context. Consequently, Plaintiffs ask this Court to look at the particular facts of this case and decide whether Examiners are users within the meaning of 17 U.S.C. §512(c), as a case of first impression.  Such analysis is needed because "the DMCA's safe harbors, as with all immunities from liability[,] should be narrowly construed."  *Capitol Records, LLC v. Escape Media Group, Inc*., 2015 WL 1402049 at *10 (S.D.N.Y. 2015) quoting *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F.Supp.2d 627, 636 (S.D.N.Y. 2011); citing *United States v. Texas*, 507 U.S. 529 (1993).  The statute is meant to "appropriately balance[ ] the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet." *UMG Recordings, Inc. v. Veoh Networks, Inc.,* 620 F.Supp.2d 1081, 1090 (C.D. Ca. 2008) citing H.R. Rep. 105–551(II), at 21.

If the District Court's decision is affirmed, it will disrupt this balance by impermissibly expanding the protections thereunder.  Stated otherwise, affirming the District Court's decision will result in the creation of near-absolute immunity from copyright infringement liability for any and all ISPs, since all content on any website would have necessarily been uploaded by a "user," as the District Court defined that term.

## D. THE DISTRICT COURT ERRED IN FINDING THAT EXAMINERS ARE USERS WITHIN THE MEANING OF 17 U.S.C. § 512(c)

### 1.  Examiners Are Compensated

Plaintiffs asked the District Court to draw a bright-line rule to distinguish Defendant's Examiners from "users."  For example, Plaintiffs argued that issuing a proclamation that <u>compensated</u> users are not "users" within the meaning of 17 U.S.C. §512(c) would be easily distinguishable and enforceable, and would present an efficient litmus test as to qualification for the safe harbor.

Although the District Court acknowledged that the Examiners who used Plaintiffs' photographs in their articles earned $415,907.56 from Defendant between June 2012 and February 2014, it did not consider that issue anywhere in its analysis of Defendant's entitlement to a safe harbor defense; despite the fact that the payment of Examiners for their contributions – alone – distinguished this case from the holdings in *Viacom, Vimeo* and *UMG II.*

Plaintiffs further argued that even if the District Court disagreed that the payment to the Examiners is singularly dispositive of the issue of whether they are DMCA "users," there were a number of other factors that, when considered in their totality, should have led the District Court to conclude that this Defendant cannot avail itself of the safe harbor protections of the DMCA.

### 2. Examiners Work Pursuant to a Written Contract

Before being granted a platform to post content to the Website, Examiners are required to sign an Examiner Agreement, which grants them a specific license to post Works to Examiner.com. A-133 – A-139. The Examiner Agreement contains numerous terms and conditions, such as requiring Examiners to provide services in the form of publishing Works that will drive legitimate traffic to the Website. A-133.

Under the Examiner Agreement, Examiners are also prohibited from posting any of their Works on any other personal, commercial, or social media website without affixing the Examiner.com logo accompanied by the words "as published on Examiner.com," which logo contains a hyperlink back to the Work as published on the Website. A-135. Since Examiners must be granted an express license to post content to Examiner.com and are required to attribute the original source of their Works to Defendant, they should not be found to be "users" within the meaning of the DMCA.

### 3. Defendant Exerts Control Over its Website

In addition to compensation and contract, Defendant also governs the format in which articles are posted to the Website, takes pride in that product, and claims ownership of same for all intents and purposes (including the publication of that content on media outlets other than Examiner.com). A-135. Despite this,

31

however, and as a result of the District Court's decision, Defendant has effectively disclaimed such ownership and/or responsibility for purposes of this copyright infringement action. This result simply makes no logical sense and, if affirmed, would offend the doctrine of judicial estoppel, which precludes a party from assuming two clearly inconsistent positions merely because that party's interests have changed. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742 (2001); *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99 (2d Cir.2010).

### E. THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFFS' PHOTOGRAPHS WERE STORED AT THE DIRECTION OF A USER

The District Court properly recognized that "safe harbor protection does not extend to all user-uploaded content, but only to content uploaded "*at the direction of a user*." A-299 quoting §512(c)(1) (emphasis in original).  To that end, the District Court asked, "whether plaintiffs' photographs were stored on defendant's system at the direction of the Examiners at issue or whether plaintiffs' photographs were stored on defendant's system at the direction of defendant [?]" *Id*.  Although the District Court concluded that Plaintiffs provided no evidence to create a genuine dispute of material fact as to this point, such conclusion was error.

As was noted above, once qualifying and being granted a platform to post content to Examiner.com, Examiners are restricted in the content that they can post, as all such topics must be approved in writing by Defendant before an

Examiner is permitted to post a Work. For example, an Examiner qualified as a Celebrity Examiner may only write on celebrity-related topics. Because Defendant alone determines the topics on which an Examiner can write, it exerts control over the Examiners. See, e.g., *UMG III*, 718 F.3d at 1026 ("Control" is defined as having the "power or authority to guide or manage: directing or restraining domination"). Control also exists because Defendant creates the actual web page for each Examiner and dictates its appearance. See, e.g., *Perfect 10, Inc. v. Cybernet Ventures, Inc*., 213 F.Supp.2d 1146, 1173 (C.D.Ca. 2002) ("*Cybernet*") (control exists where the service provider gives detailed instructions regarding issues of layout, appearance, and content).

In addition, Examiners are sent targeted emails from Defendant wherein Defendant actively solicits Works on a particular topic. *See FN4, supra.* As the subject emails show, Defendant gives Examiners specific instructions as to the content and viewpoint that it wishes to feature on the Website, and frequently requires them to include pictures or slideshows with their submissions. *Id.* In some instances, the emails include a threat that if the targeted Examiner does not post a Work, his or her account will be terminated. *Id.*

Despite the evidence before it, the District Court held that Plaintiffs failed to create a triable question of fact because "there is no indication that defendant directed the Examiners to upload plaintiffs' photographs or any other infringing

33

content" A-300.   The District Court's conclusion in this regard was not only against the weight of the evidence, but also contrary to law.

As to the evidence, it defies credulity to suggest that Defendant's instruction to Examiners to post photographs featuring on-set photos (A-224), celebrity mugshots (A-230), celebrity bodies (A-236), celebrity career moments (A-241), past and current Emmy guests (A-243), predicted Emmy winners – as they come in – and last year's red carpet looks (Id.), best couples and best young celebrities (A-245), scenes from the red carpet (A-249), on-set photos from *The Amazing Spider-Man* or *The Dark Knight Rises* (A-268), or slideshows detailing improvements in animation from film to film (A-274) is not a direct solicitation for the submission of copyrighted images.

Indeed, it is axiomatic that a media outlet such as Defendant would know that these types of photographs are almost always subject to a copyright.   To conclude that Defendant has no culpability for the solicitations made in these

emails is tantamount to willful blindness which would negate DMCA protection.[10]

Although the District Court did consider this issue, its conclusion was errant. Specifically, to the extent that Plaintiffs alleged Defendant was willfully blind, the District Court held:

> "[M]erely hosting a category of copyrightable content … with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement under §512(c)(1)(A)(i).

A-302 citing *UMG II*, 718 F.3d at 1022.

As was described above, this is not a situation in which Defendant was "merely hosting a category of copyrightable content" with only a possibility that the Website would host infringing content. In this case, Defendant actively solicited very specific content from its Examiners.  To allow an ISP to instruct a select group of its "users" to upload infringing photos from the "red carpet" or from the set of specifically identified movies and thereafter pay these "users" from revenue such illegal conduct created, yet still allow it to qualify for safe harbor

---

[10]    "The principle that willful blindness is tantamount to knowledge is hardly novel." *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 110 n. 16 (2d Cir. 2010); *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law ... as it is in the law generally."). *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003) quoting *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir.1993) (A person is "willfully blind" or engages in "conscious avoidance" amounting to knowledge where the person "'was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'"); cf. *Global–Tech Appliances, Inc. v. SEB S.A.*, ––– U.S. ––––, 131 S.Ct. 2060, 2070–71, 179 L.Ed.2d 1167 (2011);  *YouTube,* 676 F.3d at 34-34.

protection would do nothing short of making a mockery of both copyright and the alleged balance between it and the DMCA.

As to the law, by requiring Examiners to post (specific) content to the Website (periodically under threat of termination), Defendant engages in precisely the kind of purposeful conduct that brought about the infringements. *See, e.g., UMG III,* 718 F.3d at 1030, citing *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913 (2005).  Moreover, because many of the Examiners' Works are undeniably created at the specific direction of Defendant, in accordance with its guidelines, Defendant also exerts substantial influence on the activities of Examiners. *Id*. citing *Cybernet*.  In light of the foregoing, the District Court clearly erred in finding that the infringements at issue were posted at the direction of a user, rather than at the direction of Defendant.

### F.  THE DISTRICT COURT ERRED IN HOLDING THAT THE PRINCIPLES OF AGENCY LAW WERE IRRELEVANT TO ITS DETERMINATION

Should this Court, despite the foregoing arguments, find that the term "user" in Section 512(c) does in fact encompass the activities of the Examiners herein, it still must reverse and find for Plaintiffs under well-established agency law principles. The principles of agency law have a direct bearing on this case because the existence of an agency relationship would operate to impute the knowledge and/or actions of the agent to the principal.  *See, e.g., U.S. v. Dico, Inc*. 4

36

F.Supp.3d 1047, 1061, n. 32 ("It is a fundamental principle of agency law that the knowledge of an agent is imputed to his/her principal.")[11]

If an agency relationship were found to exist between Defendant and its Examiners (whether actual, apparent, or implied), it would require reversal of the District Court's decision for at least two reasons. First, even if the District Court were correct in holding that the term "user" means "someone other than the service provider," the existence of an agency relationship would result in a determination that the Examiners' acts of posting Plaintiffs' photographs would be attributable to Defendant. Second, if an agency relationship were found to exist, it would result in a determination that Defendant had knowledge of the infringing content by imputation through the Examiners. Stated otherwise, if an agency relationship were found to exist, it would not matter whether or not the Examiners were "users"

---

[11] Citing *Am. Sur. Co. v. Pauly*, 170 U.S. 133, 153 (1898) ("It is the rule that the knowledge of the agent is the knowledge of his principal, and notice to the agent of the existence of material facts is notice thereof to the principal, who is taken to know everything about a transaction which his agent in it knows."); *Tonelli v. United States*, 60 F.3d 492, 492 (8th Cir. 1995) ("As a general rule, notice to an agent is effective if the agent has a duty to receive that knowledge and report it to the principal"); *Martin Marietta Corp. v. Gould, Inc*., 70 F.3d 768, 773 (4th Cir. 1995) ("under the rule of imputation the principal is chargeable with the knowledge the agent has acquired, whether the agent communicates it or not"); *Anderson v. Gen. Am. Life Ins. Co*., 141 F.2d 898, 908 (6th Cir. 1944) ("As a general rule, the principal is held to know all that his agent knows in any transaction in which the agent acts for him." (internal citation and quotation marks omitted)); *Restatement (Second) of Agency* §272 ("[T]he liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.").

within the meaning of 17 U.S.C. §512(c), because their knowledge and actions would be imputed to Defendant regardless.

Plaintiffs cited, *inter alia,* to the holding in *Vimeo*, where the court considered the question of whether employee-uploaded videos may be deemed to have been stored "at the direction of a user." *Vimeo*, 972 F.Supp.2d at 518. To answer this question, the court concluded it "must determine whether, under traditional principles of agency law, Vimeo's employees stored their videos as independent "users" or rather on behalf of the company as Vimeo staff." *Id.* citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc*., 443 F.2d 1159, 1161–62 (2d Cir. 1971). In this case, the District Court recognized the argument but concluded that because Plaintiffs did not claim that Examiners are Defendant's employees, *Vimeo* is inapplicable. A-298. The District Court's conclusion was error, for a variety of reasons.

### 1.     An Actual Agency Relationship Exists Between Clarity and its Examiners

An agency relationship can be actual, apparent, or implied. An actual agency relationship is created "by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." Restatement (Third) of Agency, §3.01 (2006).

The Supreme Court has held that "the term 'employee' should be understood in light of the general common law of agency." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989) ("*Reid*"). In making this determination in the context of a copyright case, the Supreme Court held that the appropriate metric is to look to "the general common law of agency, rather than on the law of any particular State … given the [Copyright] Act's express objective of creating national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation." *Id*. citing *Kelley v. Southern Pacific Co*., 419 U.S. 318 (1974); *Ward v. Atlantic Coast Line R. Co*., 362 U.S. 396 (1960); *Baker v. Texas & Pacific R. Co*., 359 U.S. 227 (1959).

Consequently, to the extent that the District Court concluded that Plaintiffs did not claim that the Examiners were Defendant's employees, such statement represents a fundamental misunderstanding of not only Plaintiffs' arguments, but of the law as well.

> "An agency relationship may be informally created. No particular words are necessary, nor need there be consideration. All that is required is conduct by each party manifesting acceptance of a relationship whereby one of them is to perform work for the other under the latter's direction."

*Malloy v. Fong*, 37 Cal.2d 356, 372 (1951) citing 1 Cal.Jur., Agency, 694, 696, §§5, 7; Rest., Agency, §§15-16, 26, 34, 225.

As to an actual agency relationship, Plaintiffs relied on both the Examiner Agreement and the targeted emails Defendant sends to its Examiners.  Beginning with the Examiner Agreement, it provides that Examiners will "regularly create and post new Works to [Examiner.com] and update the Web Page as often as reasonably needed." A-133 at ¶1.  While Defendant claimed that Examiners can post as frequently or infrequently as they like, that contention is belied by other targeted emails sent by Defendant's Content Managers to Examiners who have not published in a while. A-209 – A-216.  These emails show, for example, that the Content Managers keep track of the number of articles the Examiners have posted. A-209, A-215, A-216.  Moreover, some of these emails require Examiners to publish an article by a date set by Defendant under penalty of having their account(s) deactivated. *Id.*

In light of the foregoing, the evidence strongly suggests the existence of an actual agency relationship.  For example, emails sent to the Examiners requiring that they take action (e.g., compose an article) on the principal's behalf (publish the article to Defendant's website) strongly suggest the existence of an actual agency relationship.  If this were found to be sufficient, then the Examiners would be Defendant's employees for purposes of this action under *Reid.*  By occupying such status, the posts would no longer be "at the direction of a user" but, instead,

would be at the direction of Defendant – through its employee(s). In that event, Defendant would not qualify for the safe harbor protections of 17 U.S.C. §512(c).

### 2.    An Apparent Agency Relationship Exists Between Clarity and its Examiners

An apparent agency relationship arises when "a third party is reasonably [led] to believe that the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *See, e.g., Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 6355911(C.D.Cal. 2009) ("*Fung*") aff'd in part as modified by *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ("*Fung II*") citing Restatement (Third) of Agency, §2.03 (2006) (describing "apparent authority").

The reasoning in *Fung* should serve as guidance to the Court in analyzing the question of whether an apparent agency relationship exists between Defendant and its Examiners. Specifically, in *Fung,* the court found:

> "[T]he websites' act of designating [individuals] as 'moderators' and providing them with specific forum-related powers leads a 'third party reasonably to believe [that] the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'"

*Fung,* 2009 WL 6355911 at FN.21, citing Restatement (Third) of Agency, §2.03 (2006) (describing "apparent authority").

As the United States District Court for the District of Colorado recently held, apparent authority will be found where the principal causes a third party to believe

41

that the actor had authority to act as an agent for the principal, "when the belief is reasonable and traceable to a manifestation of the principal." *Donaca v. Dish Network, LLC*, 303 F.R.D. 390, 394 (D.Colo. 2014). Further, "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Restatement (Third) of Agency, §2.03.

Here, Defendant's acts are akin to those found in *Fung*. Specifically, Defendant's act of designating contributors as Examiners and providing them with specific forum-related powers not available to visitors to the site (*i.e.*, the ability to post original stories, photographs and content) would lead a visitor to the Website to reasonably believe that Examiners have authority to act on behalf of Examiner.com, and that belief is traceable to Defendant's manifestations. *See, e.g.*, *Fung,* 2009 WL 6355911 at FN.21.

In light of the foregoing, the evidence shows that either an actual or apparent agency relationship (or both) exists between Defendant and its Examiners. That being the case, the Examiners would be considered employees of Defendant under *Reid,* and therefore not qualify for the safe harbor protection under 17 U.S.C. §512(c).

Finally, if the Examiners are considered employees of Defendant for purposes of this action, it may also demonstrate that Defendant had actual or "red

42

flag" knowledge of the infringement, by virtue of its employees interacting with the content.  See *Vimeo*, 972 F.Supp.2d at 520; see also 17 U.S.C. §512(c)(1)(a)(i) and (ii).  On this point alone, the facts are unmistakably clear.  There can be no doubt that Defendant created an implied agency relationship between it and its Examiners by holding the Examiners out as the voice of Examiner.com and providing them with privileges not available to visitors to the Website.  Consequently, a proper finding on this point would warrant a straight reversal of the District Court's decision, notwithstanding any other argument made herein.

## CONCLUSION

For all the reasons set forth herein, this Court should reverse the decision of the District Court.

## REQUEST FOR ORAL ARGUMENT

Oral argument is desired because this appeal presents complex legal issues and is a case of first impression nationwide.  As such, oral argument would likely be helpful to the panel.

Dated:      Garden City, New York
            July 31, 2015            **SANDERS LAW PLLC**

                                     By: /s/ Craig B. Sanders
                                     Craig B. Sanders, Esq.
                                     Jonathan M. Cader, Esq.
                                     100 Garden City Plaza, Ste. 500
                                     Garden City, NY 11530
                                     Telephone: (516) 203-7600
                                     *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the attached brief is proportionally spaced, has a typeface (New Times Roman) of 14 points, and contains 9,863 words (excluding, as permitted by Fed. R. App. P. 32(a)(7)(B), the corporate disclosure statement, table of contents, table of authorities, and certificate of compliance), as counted by the Microsoft Word program used to produce this brief.

Dated:     Garden City, New York
           July 31, 2015

**SANDERS LAW PLLC**

By: /s/ Craig B. Sanders
Craig B. Sanders, Esq.
Jonathan M. Cader, Esq.
100 Garden City Plaza, Ste. 500
Garden City, NY 11530
Telephone: (516) 203-7600

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) All required privacy redactions have been made pursuant to 10th Cir.R. 25.5;

(2) That the ECF submission is an exact copy of the foregoing;

(3) The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, <u>GFI Cloud Antivirus (VIPRE)</u>, and according to the program are free of viruses.


Dated:        Garden City, New York
              July 31, 2015

                              **SANDERS LAW PLLC**

                              By: <u>/s/ Craig B. Sanders</u>
                              Craig B. Sanders, Esq.
                              Jonathan M. Cader, Esq.
                              100 Garden City Plaza, Ste. 500
                              Garden City, NY 11530
                              Telephone: (516) 203-7600
                              *Attorneys for Plaintiffs-Appellants*

45

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2015 the foregoing <u>Brief for Plaintiffs-Appellants</u> was served on all parties or their counsel of record and filed with the Court through the CM/ECF system.

Dated:      Garden City, New York
           July 31, 2015

                        **SANDERS LAW PLLC**

                        By: <u>/s/ Craig B. Sanders</u>
                        Craig B. Sanders, Esq.
                        Jonathan M. Cader, Esq.
                        100 Garden City Plaza, Ste. 500
                        Garden City, NY 11530
                        Telephone: (516) 203-7600
                        *Attorneys for Plaintiffs-Appellants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00467-PAB-KMT

BWP MEDIA USA INC., d/b/a Pacific Coast News, and
NATIONAL PHOTO GROUP, LLC,

      Plaintiffs,

v.

CLARITY DIGITAL GROUP, LLC,

      Defendant.
_____

**ORDER**
_____

      This matter is before the Court on the Motion for Summary Judgment [Docket

No. 19] filed by defendant Clarity Digital Group, LLC.  The Court has subject matter

jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

      Defendant owns and operates www.examiner.com ("Examiner.com" or the

"site"), a website where were visitors can access articles on a variety of topics including

arts, entertainment, news, sports, and technology.  Docket No. 19 at 2.

      Plaintiffs are the owners of photographs, which they license for use by online

and print publications.  Docket No. 63 at 4, ¶ 18; *see also* Docket No. 1-2.  Plaintiffs

accuse defendant of copying, posting, and/or displaying 75 of their photographs

("plaintiffs' photographs") on Examiner.com without permission or authorization.  Docket

_____

        [1]The following facts are undisputed unless otherwise indicated.

No. 1 at 3, ¶ 16.  Content on the site is produced by contributing authors, referred to as "Examiners."  Docket No. 19 at 2, ¶¶ 1-2.

Defendant recruits individuals to contribute to its site.  Docket No. 21 at 2, ¶ 4. Examiner.com states that contributors will enjoy benefits such as increased exposure for their work product, compensation tied to writing activity and reader interest, "Examiner Support . . . available 24/7 to help you improve your writing, technical and marketing skills, and a team of staff "based in Denver, CO who are available to offer feedback, answer your questions and welcome you to our community of independent contributors."  Docket No. 64-4 at 2.

In order to become an Examiner, interested persons must submit an application and writing sample.  Docket No. 63 at 4, ¶ 22.  As part of their application, applicants indicate the topic on which they wish to write.  Defendant reviews applications from potential Examiners to confirm that the applicant has some ability to write, is somewhat knowledgeable regarding the topic they have chosen, and appears to be reasonably qualified to create the type of content that defendant wishes to feature on the Examiner. Docket No. 19 at 2, ¶ 2.  Defendant also conducts regular background checks on applicants.  Docket No. 64-4 at 2.  False information provided by an Examiner as part of his or her application "is grounds for immediate dismissal."  *Id.*

Once defendant accepts an applicant, defendant sends the Examiner an email confirming the topic on which that Examiner will provide content.  Docket No. 63 at 5, ¶ 21.  The Examiner must also enter into the "Examiners Independent Contractor Agreement and License" (the "Examiner agreement") before receiving permission to post to the site.  Docket No. 19 at 2, ¶ 3.  By signing the Examiner agreement, the

Examiner agrees to use his or her "best efforts" to create works on a topic for a specific Examiner.com edition, maintain his or her topic page, publish works to the topic page using the Examiner.com publishing application, create an online community related to his or her topic page, and drive legitimate traffic to the topic page. Docket No. 21-2 at 2. The Examiner agreement states that Examiners will "regularly create and post new Works to the Web Page and update the Web Page as often as reasonably needed." Docket No. 21-2 at 2, ¶ 1. The Examiner agreement obligates the examiner to "coordinate with a representative designated by Examiner.com . . . in the provision of the Services. You will alert the Representative regarding any important or interesting Works to be featured on the Web Page." Docket No. 21-2 at 2, ¶ 1.

The Examiner agreement states that Examiners "must have permission from the owner/copyright holder of any content before including it on your Web Page, unless it was provided by Examiner.com." Docket No. 12-2 at 3, ¶ 4.a.

The Examiner agreement also requires Examiners to comply with the Examiner.com Editorial Requirements (the "Editorial Requirements"). Docket No. 19 at 2, ¶ 3. The Editorial Requirements direct Examiners to follow the "AP Style" guidelines and to keep their articles free of profanity, focused on the Examiner's assigned topic "unless otherwise approved by Examiner.com," and composed of original content. Docket No. 21-3 at 2. Objectionable photos, audio, or video are prohibited unless approved by Examiner.com before publication. *Id.* at 2-3. Examiners are required to submit accurate articles, "[e]nsure that all articles posted on the site are clearly relevant to your topic," and, if a "Local Examiner," "are expected to either write about stories that are specific to their market[] or to effectively localize a National story." *Id.* at 4-5.

3

Submitted articles "should be about 200 to 400 works on average, with a minimum of 150 words." *Id.* at 5. "Any approvals by Examiner.com described in these Content Requirements should be sent to your Channel designate." *Id.* at 4. The Editorial Requirements prohibit Examiners from posting content that the Examiner does not have a right to make publicly available and state:

> Do not include any copyrighted material on our site (including text, photos, video, audio, or anything else) without the permission of the owner, and be sure to provide attribution to the source where applicable . . . . You also may not post any content that infringes any patent, trademark, trade secret, copyright or other proprietary rights of any party. Repeat infringers will be terminated as Examiners in appropriate circumstances.

*Id.* at 3-4.

An Examiner is eligible to be compensated for his or her posts pursuant to the Examiner.com Payment Policy. Docket No. 64-5 at 2. In order to be eligible for compensation, an Examiner must post a new article at least once a month. *Id.* The amount of compensation an Examiner receives is determined by a number of factors, including revenue, subscriptions, sponsorship, page view traffic, and session length. *Id.* Examiner.com does not guarantee that Examiners will be compensated for their work. *Id.*; *see also* Docket No. 64-7. The Examiners who used plaintiffs' photographs in their articles earned $415,907.56 from defendant between June 2012 and February 2014, although it is not entirely clear whether this amount reflects those Examiners' total compensation for that time period or reflects only compensation related to articles containing plaintiffs' photographs. Docket No. 63 at 5, ¶ 27; *see also* Docket No. 64-6.

Defendant asserts that it did not derive any revenue directly attributable to the plaintiffs' photographs. Docket No. 19 at 4, ¶ 9. Plaintiffs dispute this assertion, citing

to the declaration of defendant's Vice President of Content Operations Lucy Suzanne

Austin, which states, in relevant part, that defendant

> derives revenue from display advertising placed by third parties on the Examiner.com website. While those revenues are determined, in part, by the volume of visitors to Examiner.com, no advertising revenues are associated with or dependent upon any particular webpage posted by an Examiner, much less with any particular photograph posted by any examiner.

Docket No. 21 at 4, ¶ 14.

Once an Examiner has been approved and has agreed to defendants' terms, the

Examiner is given authorization to use defendant's publishing tool to contribute content

directly to Examiner.com on the Examiner's assigned topic.  Docket No. 21 at 2, ¶ 6.

The Examiner posts content on an assigned topic directly to his or her topic page,

which bears the Examiner's name and assigned topic title.  Docket No. 21 at 2, ¶¶ 6-7.

The Examiner may modify or remove an article from his or her topic page at any time,

*id.*; however, once an article is posted on the topic page, defendant exclusively

determines whether an article will be featured elsewhere on the site, such as the

Examiner.com main page or, for example, the site's "Arts & Entertainment" page.

Docket No. 63 at 5, ¶ 30.

Plaintiff disputes this, arguing that, although Ms. Austin states that defendant

does not review all material posted to the site, Ms. Austin does not state that defendant

reviews none of the material posted by Examiners.  Docket No. 63 at 4, ¶ 15 (citing

Docket No. 21 at 3, ¶ 9).

Defendant asserts, within each Examiner's assigned topic, each Examiner alone

determines the content what he or she posts to the topic site.  Docket No. 19 at 3, ¶ 5.

Plaintiffs dispute this assertion, citing to periodic emails from Examiner.com to

Examiners suggesting content that Examiner.com intends to cover and/or place "at the

top believe of the website," encouraging Examiners to "please participate and let us

help you increase your exposure to gain a bigger audience." *See, e.g.*, Docket No. 64-

10 at 7.  Defendant asserts it did not review, discuss, or approve the use of plaintiffs'

photographs before they were posted to Examiner.com.  Docket No. 19 at 5, ¶ 15.

Defendant asserts it does not pre-screen, edit, or approve articles before an Examiner

posts them to his or her topic site.  Docket No. 19 at 6, ¶ 6.  Examiners post

approximately 1,600 articles per day and defendant "does not review all of the material

posted . . . ; nor does [defendant] have the staff available to do so."  Docket No. 21 at 3,

¶ 9.  Plaintiffs dispute these assertions by citing to a screen capture from the

Examiner.com blog that states, in relevant part, "We have Content Managers and a

Review Team who provide in depth training and resources center, Examiner University,

to provide assistance and coaching.  These teams are constantly providing editorial

guidance and monitoring content to ensure there is the highest quality of accurate

information available on the site."  Docket No. 64-3 at 2.  Ms. Austin states that

defendant was previously unaware of these statements contained on the Examiner.com

blog and that such statements were promptly removed from the site.  Docket No. 65-1

at 1-2, ¶¶ 2, 4.  Ms. Austin states that, to her knowledge, defendant has never provided

"extensive training" or "constantly provid[ed] editorial guidance and monitor[ed] content"

posted to the Examiner site.  *Id.* at 2, ¶ 5.  Nonetheless, there is evidence that

Examiner.com staff communicate with Examiners regarding the content of their posts.

For example, plaintiffs provide an email exchange between defendant's Director of

Content Matt Sandy and one of the Examiner's at issue Sara Gundell.  *See* Docket No.

64-1 at 4; *see generally* Docket No. 64-9.  Mr. Sandy and Ms. Gundell discuss the lack

of traffic generated by her posts and engage in a dialogue regarding the importance of

developing contacts with movie studios and getting media credentials for movie

premieres.  *Id.* at 3-4.

      Defendant claims that Examiners can post as frequently or infrequently as they

like, *id.*, whereas plaintiffs assert that the Examiner Agreement obligates Examiners to

regularly create content as "reasonably needed."  Docket No. 21-2 at 2, ¶ 1.  Plaintiffs

also cite to emails from Examiner.com staff to Examiners "who haven't published this

month" encouraging each Examiner to publish before a certain date to "keep your

account active."  *See, e.g*, Docket No. 64-8 at 2; *see also id.* at 8-9.

      Defendant provides Examiners with free access to a library of photos it licenses

from Getty Images, regularly encouraging Examiners to make use of such photos.

Docket No. 19 at 3, ¶ 7.  An online training module that is part of Examiner University

provides examiners with additional instructions regarding copyrighted content.  *Id.* at 3,

¶ 8.  Defendant maintains a list of Examiners who have been subject to complaints for

posting copyrighted material without permission.  Docket No. 19 at 5, ¶ 16.  Under

defendant's policy, after an Examiner receives three complaints regarding instances of

infringement, the Examiner is subject to termination from use of the site.  Docket No. 20

at 4, ¶ 16.  Defendant takes no steps to interfere with third-party copyright protection

measures.  Docket No. 19 at 5, ¶ 17.

      Defendant admits that the Examiner site displayed 75 of plaintiffs' copyrighted

photographs without permission, but argues that the Examiners who included those

images in posted content did so without involvement from Examiner.com staff.  Docket

No. 63 at 4, ¶ 19; *see also* Docket No. 1-2.  On July 9, 2013, defendant received a letter from plaintiffs' counsel identifying certain of plaintiffs' photographs that appeared on Examiner.com and asserting that defendant was in violation of plaintiffs' copyrights. Docket No. 19 at 4, ¶ 11.[2]  On July 24, 2013, defendant notified plaintiffs that all identified photographs had been removed from Examiner.com.  *Id.* at 4, ¶ 12. Defendant received no other communication from plaintiffs until February 25, 2014, when plaintiffs' complaint was served on defendant.  Docket No. 19 at 4-5, ¶ 13.  On March 3, 2014, defendant's general counsel provided written notification to plaintiffs that all photographs identified in the complaint had been removed from Examiner.com on February 27, 2014.  *Id.* at 5, ¶ 14.

On February 24, 2014, plaintiffs filed this case against defendant and the Anschutz Corporation.  Docket No. 1.  On April 7, 2014, plaintiffs voluntarily dismissed the Anschutz Corporation from the case.  Docket No. 11.  Plaintiffs bring claims against defendant for direct copyright infringement, contributory copyright infringement, vicarious copyright infringement, and inducement of copyright infringement.  Docket No. 1 at 4-6.  Plaintiffs also seek injunctive relief and attorneys' fees.  *Id.* at 7.

On May 15, 2014, defendant filed the present motion seeking summary judgment in its favor on all plaintiffs' claims.  Docket No. 19.  Defendant argues that it is entitled to immunity from plaintiffs claims under the "safe harbor" provision of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c).  *Id.* at 1.  In the alternative,

---

[2]At all times relevant, defendant has had a Designated Agent to Receive Notification of Claimed Infringement and has place contact information for its agent on Examiner.com.  Docket No. 19 at 4, ¶ 10.

defendant argues that it is entitled to judgment as a matter of law on plaintiffs' claim for inducement of copyright infringement.  Docket No. 19 at 17.  On June 20, 2014, plaintiffs filed a motion under Fed. R. Civ. P. 56(d) seeking to defer further briefing on defendant's motion pending discovery on the applicability of the safe harbor provision. Docket No. 36.  On August 7, 2014, the assigned magistrate judge granted plaintiffs' motion in part.  Docket No. 46.  On February 17, 2015, plaintiffs filed their response brief to defendant's motion for summary judgment.  Docket No. 63.  On March 9, 2015, defendant filed its response brief.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

Appellate Case: 15-1154    Document: 01019469003    Date Filed: 07/31/2015    Page: 66

### III.  ANALYSIS

The DMCA was enacted in 1998 with one of its goals being to "update domestic copyright law for the digital age."  *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26 (2d Cir. 2012).  In so doing, Congress did not alter existing copyright law, but instead created safe harbor provisions to limit liability for "service providers."  *Id.* at 27; *see also UMG Recordings v. Shelter Capial Partners LLC* ("*UMG II*"), 718 F.3d 1006, 1028 (9th Cir. 2013) ("Congress explicitly stated in three different reports that the DMCA was intended to protect qualifying service providers from liability for all monetary relief for direct, vicarious, and contributory infringement.") (emphasis and quotations omitted).  "Because the DMCA safe harbors are affirmative defenses, [defendant] has the burden of establishing that [it] meets the statutory requirements."  *Columbia Pictures Indus., Inc. v. Fung* ("*Fung II*"), 710 F.3d 1020, 1039 (9th Cir. 2013).

To qualify for safe harbor protection, a party must satisfy a set of threshold criteria.  *Viacom*, 676 F.3d at 27.  First, the party must be a "service provider" as that term is defined under the DMCA.  17 U.S.C. § 512(k)(1).  Second, in satisfying "conditions of eligibility," the party must adopt and reasonably implement "a policy that provides for the termination in appropriate circumstances of subscribers and account holders . . . who are repeat infringers" and must accommodate "standard technical measures" that copyright owners use to identify or protect copyrighted works.  § 512(i).  Here, plaintiffs concede that defendant is a "service provider" and do not dispute that defendant has satisfied the threshold conditions of eligibility.  *See* Docket No. 63 at 7.  Once a service provider initially qualifies for protection under the DMCA, it must satisfy

10

the requirements of a particular safe harbor.  *Viacom*, 676 F.3d 27.

**A.  Applicability of § 512(c)**

The parties dispute whether defendant is entitled to protection pursuant to the

§ 512(c) safe harbor provision.

> A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider--
>
> **(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> **(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> **(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>
> **(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> **(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

§ 512(c)(1).[3]

### *1.  "at the direction of a user"*

Section 512(c) applies to infringements that occur "by reason of the storage at

the direction of a user of material" on a service provider's system or network.

---

[3]Section 512(c)(2) also requires that the service provider have a designated agent to receive notifications of claimed infringements.  Plaintiffs do not dispute that defendant has properly registered such an agent for receipt of DMCA notices.  *See* Docket No. 63 at 7.

§ 512(c)(1).  Thus, before reaching the three prongs of the § 512(c) safe harbor

defense,  *see* § 512(c)(1)(A)-(C), the initial applicability of § 512(c) turns on whether the

claimed infringements occurred in the manner contemplated by § 512(c)(1).  Plaintiffs

dispute only whether the Examiners at issue are "user[s]" under § 512(c).  Docket No.

63 at 11-12.  Plaintiffs argue that the term "user" should not be given its plain and

ordinary meaning, but should instead be defined so as to exclude from the "user" a

service provider's "owner[s], employee[s] and/or agent[s]."  *Id.* at 9.  Defendant, on the

other hand, argues that the term "user" is not a term of art and refers to any person who

uses an "internet-based platform."  Docket No. 65 at 5.  Defendant contends that the

proper inquiry for determining the threshold applicability of § 512(c) is "[w]as the

allegedly infringing content at issue posted '***at the direction of*** *a user*' or was it 'at the

direction of' [defendant]?"  *Id.* (citation and quotations omitted, emphasis in original).

Defendant takes the position that this question is best answered by reference to

traditional principles of agency law.  *Id.*

The Court first turns to the meaning of the term "user."  Section § 512(c) does

not define "user" and it appears, as the parties' briefs suggest, that no court has

squarely construed the term.  In interpreting a statute, the Court begins with the plain

language of the statute, interpreting it "in light of the purposes Congress sought to

serve" and considering a particular provision's place in the overall statutory scheme.

*Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006) (quotations

omitted).  "If the statutory language is clear, our analysis ends and we must apply its

plain meaning."  *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1161 (10th Cir.

Appellate Case: 15-1154   Document: 01019469003   Date Filed: 07/31/2015   Page: 69

2011).  If the court determines that the statute is ambiguous, "the court then looks

beyond the plain text to resolve the ambiguity, examining legislative intent [and] overall

statutory construction."  *Id.* (quotations omitted).

Here, the words of § 512(c) do not compel the conclusion that "user" should be

defined narrowly or with reference to traditional principles of agency.  The dictionary

definition of "user" is "one that uses," and the definition of "use" is "to put into action or

service: to avail oneself of" or "to carry out with a purpose or action by means of."

*Merriam-Webster's Collegiate Dictionary* 1297 (10th ed. 2001).  If these definitions are

applied to § 512(c)(1), then "user" describes a person or entity who avails itself of the

service provider's system or network to store material.  This description is consistent

with the generally understood meaning of the term in the DMCA context.  *See Viacom*,

676 F.3d at 39 (referring to "users" both as persons who upload content to YouTube

and persons who access YouTube to view uploaded content); *UMG II*, 718 F.3d at

1018 (same).

Plaintiffs argue that the term "user" cannot be interpreted in this way because

"[o]wners, employees and agents are typically users of their business' website" and

"courts have already found that owners, employees, agents (and even implied agents)

are not 'users' within the meaning of the DMCA safe harbor provisions."  Docket No. 63

at 8-9.  Therefore, plaintiffs claim that "case law dictates that the word 'user' is a legal

term of art for purposes of applying the safe harbor provisions of the DMCA."  *Id.* at 9.

There are several problems with this argument.  First, plaintiffs assume that the word

"user" cannot be given its plain meaning because there is a need to distinguish between

13

storage at the direction of the service provider and storage at the direction of third parties and that such distinction should be made through the interpretation of "user." However, as other provisions of § 512 demonstrate, Congress knew how to make such a distinction without mentioning "user."  Both §§ 512(a)(1) and 512(b)(1)(A) utilize the phrase "a person other than the service provider" to differentiate between the service provider and other persons.  More specifically, § 512(a)(1) uses the phrase "at the direction of a person other than the service provider," which is analogous to the distinction that plaintiffs urge be made through the definition of "user" in § 512(c)(1). The fact that Congress elsewhere in the statute made the distinction between service providers and third parties with different words cautions against plaintiff's interpretation.

Second, the perceived need to distinguish between service providers and third parties in the language of  § 512(c)(1) does not exist.  The service provider behavior that plaintiffs are concerned about is already addressed in subparagraphs (A) through (C) of § 512(c)(1).  For example, the term "storage" limits a service provider from invoking safe harbor protection for its own conduct because, although "storage" encompasses "automated process[es] for making files accessible," *UMG II*, 718 F.3d at 1020, service providers lose protection for activities they undertake that lack a causal connection to user-initiated storage of infringing material.  *See, e.g.*, *Viacom*, 676 F.3d at 40 (remanding for further fact finding where YouTube manually selected "copyrighted material for licensing to a third party"); *Gardner v. CafePress Inc.*, 2014 WL 794216, at *1 (S.D. Cal. Feb. 26, 2014) (ruling that service provider who had exclusive control of marketplace where uploaded infringing images were sold and ability to modify such images was not entitled to safe harbor protection as a matter of law).  Moreover,

14

§ 512(c)(1)(B) excludes from safe harbor protection infringing activity that confers a financial benefit upon the service provider if the service provider "exert[s] substantial influence on the activities of users," such as "high levels of control over activities of users" or "purposeful conduct." *UMG II*, 718 F.3d at 1030.  Thus, to define the term "user" narrowly or to read agency principles into the term would, in many instances, be unnecessary and redundant given the effect of § 512(c)'s other provisions.  *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 877 (1991) (noting that court should avoid interpreting a statutory provision "so as to render superfluous other provisions in the same enactment").

The cases upon which the parties rely do not compel a different interpretation of the term "user."  Both parties cite to *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 517-18 (S.D.N.Y. 2013), in support of their respective arguments.  In *Vimeo*, the court considered whether § 512(c) applied to protect the video sharing site Vimeo from copyright infringement liability for videos uploaded by Vimeo employees.  *Id.* at 518.  Plaintiff argued that such videos were not "stor[ed] at the direction of a user."  *Id.* Although the court did not identify an ambiguity in § 512(c)(1), it relied on legislative history that stated "'[i]nformation that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within the liability limitation of subsection (c).'"  *Id.* at 517 (quoting S.Rep. No. 105-190, at *43 (1998)).[4]  In determining if "employee-uploaded videos may

[4]This legislative history does not indicate that the term "user" was intended to mean what plaintiffs suggest.  Moreover, the legislative history does not indicate that the issue of whether information resides on a system through the acts or decisions of a service provider must be addressed, as the parties appear to argue, by a dispositive,

be deemed to have been stored 'at the direction of a user,'" the Court concluded that

the relevant inquiry was whether, "under traditional principles of agency law, Vimeo's

employees stored their videos as independent 'users' or rather on behalf of the

company as Vimeo staff." *Id.* at 518 (citing *Gershwin Publ'g Corp. v. Columbia Artists

Mgmt., Inc.*, 443 F.2d 1159, 1161-62 (2d Cir. 1971) (discussing vicarious and

contributory copyright infringement)).  However, the court did not, as plaintiffs suggest,

define the term "user" or otherwise explain why traditional agency principles were the

appropriate measure by which to determine whether Vimeo was entitled to § 512(c)

protection as opposed to, for example, charging Vimeo with knowledge of its

employees' uploads under § 512(c)(1)(A).  Moreover, unlike *Vimeo*, plaintiffs here do

not claim that the Examiners at issue were defendant's employees.  As a result, *Vimeo*

is not directly applicable to the present dispute.

    Plaintiffs cite to *Columbia Pictures Indus., Inc. v. Fung* ("*Fung I*"), 2009 WL

6355911, at *13 (C.D. Cal. Dec. 21, 2009), *affirmed in part as modified by Fung II*, 701

F.3d at 1020, where the court considered whether the operator of multiple bit torrent

websites was liable for inducement of infringement due, in part, to statements made by

moderators on defendants' websites.  However, *Fung I* did not interpret the term "user"

or the initial requirements of § 512(c) and is therefore inapplicable.

    Defendant cites *Capitol Records, Inv. v. MP3tunes, LLC*, 821 F. Supp. 2d 627,

635 (S.D.N.Y. 2011), *modified on reconsideration on other grounds by* 2013 WL

1987225 (S.D.N.Y. May 14, 2013), where defendant's executives used their personal

---

initial inquiry as to the meaning of "user."  To so conclude would contravene or render
superfluous other provisions of § 512(c).

accounts to download copyrighted songs onto defendant's servers.  The court did not

consider whether defendant's executives were "users," but rather whether the

executives' activity was sufficient to satisfy § 512(c)(1)(A)'s actual or "red flag"[5]

knowledge requirement.  *Id.* at 644.  The court concluded that, because plaintiff failed

to show that defendant's executives downloaded songs "from clearly pirate websites,"

such activity was, by itself, insufficient to confer the requisite knowledge on defendant.

*Id.*  *MP3tunes* is therefore unhelpful in resolving whether defendant has satisfied the

initial requirements of § 512(c)(1).

      For the foregoing reasons, the Court rejects plaintiffs' proposed definition of the

term "user" and instead adopts the plain meaning definition the Court identified earlier.

Plaintiffs do not raise any other arguments regarding the initial requirements of

§ 512(c)(1).  As a result, the Court finds that the Examiners are "users" within the

meaning of the statute.  However, as discussed above, safe harbor protection does not

extend to all user uploaded content, but only to content uploaded "*at the direction of* a

user."  § 512(c)(1) (emphasis added).  The question becomes whether plaintiffs'

photographs were stored on defendant's system at the direction of the Examiners at

issue or whether plaintiffs' photographs were stored on defendant's system at the

direction of defendant.  On this question, plaintiffs provide no evidence creating a

genuine dispute of material fact.

      Defendant asserts each Examiner alone determines the content of his or her

---

[5]So called "red flag" knowledge refers to an awareness of the "facts or
circumstances from which infringing activity is apparent."  *See UMG II*, 718 F.3d at
1023.

articles, including whether or not they are illustrated by photographs.  Docket No. 19 at

3, ¶ 5.  Plaintiffs attempt to create a genuine dispute of material fact by citing to emails

from defendant to Examiners where defendant solicits articles on specific topics.  *See*

*generally* Docket No. 64-10.  For example, defendant emailed Examiners to announce

a new "Examiner Celebrity" page.  *Id.* at 17.  Defendant states that it is looking for

content concerning celebrities' physiques, fashion trends, or news and that "[s]lide

shows are a must for this area."  *Id.*  However, there is no indication that defendant

directed the Examiners to upload plaintiffs' photographs or any other infringing content.

The record contains no evidence of any communications between defendant and the

Examiners at issue regarding plaintiffs' photographs or the posts in which plaintiffs'

photographs appeared.  Defendant asserts that it did not pre-screen, edit, or approve

any of the content at issue before it was posted to Examiner.com.  Docket No. 19 at 3,

¶ 6.  Although a dispute of fact may exist as to whether defendant had content

managers or a review team, Docket No. 64-3 at 2; Docket No. 65-1 at 1-2, ¶ 5, there is

no evidence suggesting that a content manager, review team, or any Examiner.com

staff had any actual control or influence over the content of the articles containing

plaintiffs' photographs so as to render the use of plaintiffs' photographs at the direction

of defendant.

Moreover, defendant explicitly directs Examiners not to post infringing content,

stating in the Examiner agreement that Examiners "must have permission from the

owner/copyright holder of any content before including it on your Web Page, unless it

was provided by Examiner.com."  Docket No. 21-2 at 3, ¶ 4.a.  The Editorial

Requirements contain a similar prohibition on unlicensed content.  *See* Docket No. 21-3

18

at 3, ¶ 6 ("[d]o not include any copyrighted material on our site (including text, photos, video, audio, or anything else) without the permission of the owner").  Defendant notifies Examiners of its repeat infringer policy and has barred repeat copyright infringers from posting material on Examiner.com.  *See* Docket No. 20 at 4-5, ¶¶16-19.  Defendant also provides Examiners with free access to a library of licensed photos, regularly encouraging examiners to make use of such photos.  Docket No. 19 at 3, ¶ 7.  These agreements and policies may not, by themselves, be sufficient to render the upload of infringing material "at the direction of a user."  However, in the absence of evidence that defendant directed the Examiners at issue to upload plaintiffs' photographs to the site, defendant's policies further support the conclusion that plaintiffs' photographs did not come to reside on Examiner.com at the direction of defendant.  Defendant has presented sufficient evidence upon which to satisfy the initial requirements of § 512(c)(1), and plaintiffs have failed to provide evidence or argument that creates a genuine dispute of material fact.

## 2. *Knowledge*

Defendant asserts that it has satisfied § 512(c)(1)(A) because, upon receiving information from plaintiffs' counsel notifying defendant that plaintiffs' photographs were posted on Examiner.com, it promptly removed plaintiffs' photographs from the site.  Docket No. 19 at 4-5, ¶¶ 11-14 (citing Docket No. 20).  Plaintiffs argue that defendant had actual knowledge pursuant to § 512(c)(1)(A)(i) or "red flag" knowledge pursuant to § 512(c)(1)(A)(ii) because it was "willfully blind" to infringements occurring on Examiner.com.  Docket No. 63 at 16-17.

The safe harbor provision of § 512(c) does not place upon the service provider

the burden of determining whether materials on its system or network are actually illegal. *Viacom*, 676 F.3d at 32.  "[M]erely hosting a category of copyrightable content . . . with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement under § 512(c)(1)(A)(i)." *UMG II*, 718 F.3d at 1022.  Rather, § 512(c) requires knowledge or awareness "of [the] specific infringing activity." *Viacom*, 676 F.3d at 30.  Thus, "the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Id.* at 31.  The willful blindness doctrine may be applied in the context of § 512(c)(1)(A), but only to the extent the evidence establishes that a service provider "willfully bur[ied] its head in the sand to avoid obtaining . . . knowledge" of the specific infringing activity. *UMG II*, 718 F.3d at 1023.

The only evidence plaintiffs provide of defendant's willful blindness to the Examiners' use of plaintiffs' photographs is the series of emails from defendant to various examiners requesting photos and videos regarding "the Oscars, new TV lineups and premiers, new movies, celebrity scandals, celebrity bodies, celebrity styles, celebrity news and Emmy Awards fashions."  Docket No. 63 at 17-18 (citing Docket No. 64-10).  However, plaintiffs do not provide any evidence that, by posting photos or videos on such topics, Examiners would necessarily use plaintiffs' copyrighted photographs.  The emails upon which plaintiffs rely, at best, suggest that defendant may have had a general awareness that Examiners could post infringing content in response to such requests, but general awareness is insufficient to create a genuine

20

dispute as to whether defendant had knowledge of or was willfully blind to the specific

infringements alleged in this case.  *See UMG II*, 718 F.3d at 1023.  Plaintiffs otherwise

fail to provide evidence specific to any of the claimed infringements upon which a

reasonable juror could conclude that defendant possessed the requisite actual or red

flag knowledge.

As to § 512(c)(1)(A)(iii), plaintiffs do not dispute that, upon receiving information

from plaintiffs' counsel regarding the claimed infringements, defendant acted

expeditiously to remove plaintiffs' photographs from Examiner.com.  Defendant has

provided sufficient evidence upon which to conclude that it satisfied the requirements of

§ 512(c)(1)(A).  Plaintiffs have failed to provide evidence creating a genuine dispute of

material facts.  As a result, defendant is entitled to summary judgment as to

§ 512(c)(1)(A).

### 3.  *"financial benefit directly attributable to the infringing activity"*

In order to receive safe harbor protection, the service provider must establish

that it "does not receive a financial benefit directly attributable to the infringing activity,

in a case in which the service provider has the right and ability to control such activity."

§ 512(c)(1)(B).  As to the issue of financial benefit, Ms. Austin states that defendant

derives revenue from display advertising placed on Examiner.com, but, although "those

revenues are determined, in part, by the volume of visitors to Examiner.com, no

advertising revenues are associated with or dependent upon any particular web page

posted by an Examiner, much less any particular photograph posted by any examiner."

Docket No. 21 at 4, ¶ 14.  Plaintiff argues that the fact that defendant receives revenue

from display advertising and the fact that Examiners are contractually obligated to drive

traffic to the site creates "a symbiotic relationship between AXS and its Examiners, whereby both derive a financial benefit from the Examiners' efforts to drive traffic to the Website and share in the resulting revenue derived by such traffic."  Docket No. 63 at 19.  Plaintiffs provide no additional evidence in support of their argument.

The Ninth Circuit has suggested that, where a service provider charges users for its services, a directly attributable financial benefit exists "where there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits."  *Fung II*, 710 F.3d at 1044 (quotations omitted, emphasis in original).  Where, as here, the service provider derives its revenue from advertising, the inquiry focuses on whether "the connection between the infringing activity and [the service provider's] income stream derived from advertising is sufficiently direct."  *Id.* at 1045.  In *Fung II*, the court found a sufficient connection based upon a confluence of circumstances: "Fung promoted advertising by pointing to infringing activity; obtained advertising revenue that depended on the number of visitors to his sites; attracted primarily visitors who were seeking to engage in infringing activity, as that is mostly what occurred on his sites; and encouraged that infringing activity."  *Id.*; *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) (holding that, where a service provider derives revenue from subscribers, the relevant inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit" (quotations omitted)); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 748 (S.D.N.Y. 2012) (finding no direct financial benefit where no evidence indicated that defendants

22

"capitalize[] specifically because a given image a user selects to print is infringing").

Here, there is no evidence that defendant marketed to advertisers by pointing to infringing content, that users considered Examiner.com a reliable source of infringing content, that any users visited Examiner.com because it hosted infringing content, or that defendant actively promoted infringing content as a way of attracting more page views. *Cf. Fung II*, 710 F.3d at 1045. To the contrary, the record reflects that defendant promptly removes infringing content of which it has become aware and has policies directed at curtailing infringing activity. As a result, there are no facts supporting an inference that defendant's revenue stream is in any way predicated on or derived from the availability of infringing material on Examiner.com. Because plaintiffs have failed to provide evidence upon which to conclude that defendant derives direct financial benefit from infringing activity, the Court need not reach the question of whether defendant had a right and ability to control infringing activity.[6] Defendant is therefore entitled to summary judgment as to § 512(c)(1)(B).

Plaintiffs do not dispute any remaining aspects of § 512(c). As a result, the Court concludes that defendant is entitled to § 512(c) safe harbor protection. Defendant's motion for summary judgment is granted and plaintiffs' claims for direct copyright infringement, contributory copyright infringement, vicarious copyright infringement, and inducement of copyright infringement are dismissed. *See UMG II*, 718 F.3d at 1013, 1031 (upholding grant of summary judgment in service provider's

---

[6]Although the "right and ability to control" inquiry is often treated as a threshold issue, *see, e.g.*, *UMG II*, 718 F.3d at 1026, the Court need not reach that inquiry in order to resolve the present motion.

favor on claims for direct, vicarious, contributory, and inducement of copyright infringement).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's Motion for Summary Judgment [Docket No. 19] is **GRANTED**.  It is further

**ORDERED** that plaintiffs' claims are dismissed and this case is dismissed in its entirety.

DATED March 31, 2015.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00467-PAB-KMT

BWP MEDIA USA INC., d/b/a Pacific Coast News, and
NATIONAL PHOTO GROUP, LLC,

      Plaintiffs,

v.

CLARITY DIGITAL GROUP, LLC,

      Defendant.

_____

### FINAL JUDGMENT
_____

      In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

      Pursuant to the Order [Docket No. 66] of United States District Judge Philip A. Brimmer entered on March 31, 2015, it is

      ORDERED that defendant's Motion for Summary Judgment [Docket No. 19] is **GRANTED**.  It is further

      ORDERED that judgment is hereby entered in favor of defendant CLARITY DIGITAL GROUP, LLC and against plaintiffs BWP MEDIA USA INC., d/b/a Pacific Coast News, and NATIONAL PHOTO GROUP, LLC.  It is further

      ORDERED that defendant is **AWARDED** its costs, to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated at Denver, Colorado this 31st day of March, 2015.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By:  s/  Kathy Preuitt-Parks

Kathy Preuitt-Parks
Deputy Clerk